**FILED**

# UNITED STATES DISTRICT COURT

NOV 1 8 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

_____ NORTHERN _____ DISTRICT OF ___ ILLINOIS, EASTERN DIVISION ___

UNITED STATES OF AMERICA

v.

DARIUS REIKA
KLAIPEDA, LITHUANIA

NOV 2 5 2003

**MAGISTRATE JUDGE MASON**

**CRIMINAL COMPLAINT**

CASE NUMBER: **03CR1093**

03 cr 1093

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my

knowledge and belief. On or about ___ March 2000 ___ in ___ Cook ___ county, in the

___ Northern ___ District of ___ Illinois ___ defendant did, (Track Statutory Language of Offense)

knowingly conspire to commit certain offenses against the United States, namely,

**(1)** to utter, use, attempt to use , possess, obtain, accept and receive a visa, or other document prescribed by statute or regulation for entry into the United States, knowing it to be falsely made or to have been otherwise procured by fraud or unlawfully obtained, and

**(2)** to directly and indirectly corruptly give, offer, and promise a thing of value, namely money, to a public official to influence an official act,

in violation of Title ___ 18 ___ United States Code, Section(s) 2, 371 ___ .

I further state that I am a(n) ___ Special Agent, DSS ___ and that this complaint is based on the following
<span>Official Title</span>

facts:

SEE ATTACHED

Continued on the attached sheet and made a part hereof: _X_ Yes _____ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

_Michael T. Mason_
November 18, 2003

at ___ Chicago, Illinois ___
City and State

_____
Name & Title of Judicial Officer
Honorable Michael T. Mason

_____
Signature of Judicial Officer

County of Cook     )
                       )    SS:
State of Illinois     )

Matthew B. Sweeney, being first duly sworn on oath, avers and states:

## INTRODUCTION

(1) I am a Special Agent with the Diplomatic Security Service ("DSS"), United States Department of State and have been so employed since June 2002. Prior to my employment as a Special Agent for the Diplomatic Security Service, I worked for the Federal Bureau of Investigation as an Operations Security Assistant for three years. Prior to my employment with the FBI, I served with the United States Marine Corps as an artilleryman, and as an embassy guard in Caracas, Venezuela and in Warsaw, Poland.

(2) This affidavit is submitted to seek the issuance of an arrest warrant for an individual by the name of Darius Reika on charges of conspiracy to commit bribery and visa fraud in violation of Title 18, United States Code, Sections 2, 371, 201(b)(1)(A) and 1546. Darius Reika resides in Klaipeda, Lithuania and the United States is seeking his extradition to the United States.

(3) This affidavit is based upon my personal knowledge and participation in this investigation, my discussions with other DSS and Immigration and Customs Enforcement ("ICE") agents, discussions with local law enforcement officers, interviews of cooperating witnesses, interviews with Darius Reika and review of various law enforcement, state department and ICE records as detailed below.

## ISSUANCE OF VISAS

(4) The United States Department of State is the federal agency responsible for the

1

issuance of visas to non-citizens who wish to enter the United States. Non-citizens who wish to acquire visas to enter into the United States must fill out a visa application form, submit photographs, pay a nominal application fee and then appear for an interview with a Consular Officer at the American Embassy. The Consular Officer screens applicants for visas according to criteria established by the State Department and Congress.

(5) There are many different types of visas which can be issued to immigrants ranging from visitor's visas ("B1", "B2" visas ) to special labor visas ("H1b" visas). Visas can be issued for differing lengths of time, and for single or multiple entries. Once a Consular Officer ascertains that an applicant meets the visa criteria, he issues the visa which is appended inside the immigrant's passport and may be used to seek entry to the United States. Many visa applicants do not meet the criteria and are denied visas.

(6) Visas to the United States are highly sought after, particularly in countries such as Lithuania which are former Soviet States. A visa recipient is supposed to return to his homeland when his visa expires, and may legally remain in the United States only if he obtains legal status from ICE. Based upon my experience as a Special Agent for DSS, I know that many individuals who acquire visitor's visas do not obtain visas with the intent to visit the United States but intend to enter and permanently reside, albeit illegally, in the United States.

**BRIBES FOR VISAS**

(7) On September 2, 2003, I interviewed a young Lithuanian woman (hereinafter "Cooperating Witness or CW 1") who has agreed to plead guilty to a felony violation of Title 18, United States Code, Section 1028(a)(6) and to cooperate with this investigation. I have been able to corroborate many of the matters CW 1 related to me and I believe that she has been

2

truthful and candid about her involvement in a scheme to acquire visas through bribes. I have spoken several times since September 2, 2003 with CW 1 who has continued to supply information to me concerning this scheme.

(8)    CW 1 advised me that she arrived in the United States from Lithuania on July 17, 2000 with a visa that she had obtained from an individual by the name of Darius Reika. CW 1 advised me that she obtained the visa in the summer of 2000 in exchange for a cash payment of $4,000 to Darius Reika. CW 1 also advised me that several months before her arrival in Chicago, she tendered her passport to Reika in Klaipeda, Lithuania . CW 1 stated that Reika then returned her passport several months later with an American visa in it. Reika charged CW 1 $4,000 for the visa and an airline ticket to the United States. CW 1 advised me that her brother, who resided in the United States, made the payment of $4,000 to Reika through Western Union. As detailed in paragraphs 17 and 19 below, I have been able to confirm that CW 1's brother transferred money to Reika via Western Union. Critically, CW 1 advised me that she never went to the American embassy in Vilnius, Lithuania to submit a visa application, nor was she ever interviewed by the American Consular Officer. CW 1 explained that Reika told her he got her visa from a Lithuanian man who had a contact in the American embassy.

(9)   CW 1 advised me that she knew of several other individuals who acquired visas through Reika in the same manner, *i.e.*, a cash payment to Reika and no visit or interview at the American embassy, including her boyfriend. CW 1 advised me that these individuals were friends or admitted to her how they acquired their visas.

(10)   On September 3, 2003, I interviewed another individual, (hereinafter "CW 2") who agreed to cooperate with this investigation.  I have been able to corroborate many of the matters

3

CW 2 related to me and I believe that he has generally been truthful and candid about his involvement in a scheme to acquire a visa by paying a bribe. I have spoken several times with CW 2 who has continued to supply information to me concerning this scheme.

(11)   CW 2 advised me that he arrived in the United States from Lithuania on March 3, 2000.   CW 2 advised me that he wanted to get a visa to come to the United States  and a friend referred CW 2 to a person by the name of Darius.   CW 2 advised me that he did not know Darius's last name. CW 2 stated that he met Darius in February 2000 at a post office in Klaipeda, Lithuania  and Darius told CW 2 that it would cost $14,000 for a plane ticket and visa to the United States. CW 2 advised me that was skeptical and  expressed concern to Darius that he would not get a real visa for his money. Darius assured CW 2 that he would get a real visa, and told CW 2 that he did not have to pay him (Darius) until after CW 2 successfully used the visa to enter the United States. Darius told CW 2 that he got the visas through a guy in the American embassy.

(12)  CW 2 stated that two weeks after he tendered his passport to Darius, he again met Darius at the post office in Klaipeda, Lithuania.   Darius showed CW 2 his passport which now contained a visa to the United States.   Darius later obtained a plane ticket for CW 2 and met CW 2, handing CW 2 the passport with the American visa, a telephone number to call when he arrived in the United States to help him find employment and a place to stay and the plane ticket. Darius  admonished CW 2  not  to forget to pay him the $14,000, telling CW 2 that he (Darius) knew where his (CW 2's) family was.

(13)  CW 2 advised me that after he arrived in the United States, he came to the Chicago area where he worked several jobs for a year to pay the money Darius demanded for the visa.

4

CW 2 advised me that he paid the $14,000 to CW 3.  CW 2 advised me that he knew that CW 3

split the $14,000 fee for the visa with Darius Reika, and that CW 3 sent the money to Darius by

Western Union.  Through interviews with CW 3 and a review of Western Union wire transfers, I

have been able to corroborate that CW2 did pay CW 3 $14,000, and that CW 3 sent Reika's

share of the money to Lithuania by Western Union.

(14)  Although CW 2 has been truthful about his role in this visa fraud/bribery scheme,

CW 2 did admit to me that he initially lied to me about one aspect of his story.  CW 2 initially

told me that he paid Darius $1,000 in Klaipeda and left $13,000 with his roommate to pay

Darius.  When interviewed on a second occasion, CW 2 admitted that he had not been

completely truthful and lied about his payment of money to CW 3.  CW 2 explained to me that

he did pay $14,000 for the visa, but that he paid the money after he arrived in the United States

and that he paid the money to CW 3.

(15)  I interviewed CW 3 on September 4, 2000 and CW 3 has agreed to cooperate with

this investigation.  I believe that CW 3 has been truthful and candid about his role in this scheme,

and I have been able to corroborate many of the facts CW 3 has related to me.  CW 3 has agreed

to plead guilty to a felony violation of Title 18, United States Code, Section 1028(a)(6) and to

cooperate with this investigation.  I have spoken to CW 3 on a number of occasions since my

initial interview on September 4, 2003.

(16)  CW 3 is the brother of CW 1.  CW 3 advised me that he entered the United States

approximately seven years ago, falsely representing on a visa application that he was coming to

the United States for security training.  In fact, he had no intention of attending any security

training and he stayed in the United States after his visa expired.  CW 3 advised me that he has

5

used two aliases since his arrival in the United States. In the first instance, he acquired a driver's license in a friend's name, Raimondas Gitelis, and in the second instance, he used the last name "Gaugela" to acquire a social security card.

(17) CW 3 told me that Darius Reika who resides in Klaipeda, Lithuania was a childhood friend. CW 3 advised me that Reika had called him from Lithuania ( he did not remember when although he advised me that it was sometime in early 2000, contemporaneous in time with when CW's 1 and 2 acquired their visas from Reika). CW 3 advised me that Reika told him that he (Reika) knew someone by the name of Ovidijus who could get visas from the American embassy. CW 3 stated that he and Reika discussed this as a way to make money, and to help friends to get visas to come to the United States. CW 3 told me that he agreed to front money for people who wanted to get visas, typically, about $3,000 per visa. With the plane ticket to the United States, the total price was typically $4,000 although on occasion CW 3 charged as much as $14,000.. CW 3 advised me that once the people got the visas from Reika and arrived in the United States, they had to pay CW 3 the fee for the visa and CW 3 wire transferred the money via Western Union to Reika in Lithuania. CW 3 advised me that he profited from the visa fraud scheme in two instances: with CW 2 whom CW 3 charged $14,000 and with another individual whom CW 3 charged $13,000. CW 3 split his profit in both instances with Reika.

(18) CW 3 explained to me how the scheme worked. The person who wanted a visa would give Reika their passport and the application fee for the visa. CW3 would front the $3,000 fee for the visa and wire transfer it to Reika via Western Union. CW 3 told me that Reika paid the money for a visa to a man by the name of Ovidijus and that Ovidijus or his wife then paid a bribe to an American at the embassy who issued the visas. CW 3 advised me that he

6

acquired visas for at least five individuals, including his sister (CW 1) and CW 2.

(19) I have reviewed records of Western Union wire transfers to Darius Reika which took place in the year 2000, contemporaneous with the payments to Reika for the visas. I have identified three payments to Reika totaling $15,900 between April 1, 2000 and June 10, 2000 . The senders are Olga Gitel ($10,200) and Raimondas Gitelis ($5,700). I interviewed Olga Gitel on October 22, 2003 and she advised me that she was CW 3's girlfriend. When I inquired about her two Western Union wire transfers to Reika, she advised me that CW 3 gave her cash and asked her to send it to Reika for him. I also interviewed Raimondas Gitelis on the same date and showed him the wire transfer in his name to Reika. He told me that he had not sent any money to Reika but believed that the wire transfer had been made by CW 3 . He explained to me that CW 3 had fraudulently obtained a driver's license in Raimondas Gitelis's name. I was able to corroborate that CW 3 had a driver's license in the name of Raimondas Gitelis because I have reviewed police reports and booking pictures from the Westmont Police Department relating to a DUI arrest in the name of Raimondas Gitelis but the booking picture is of CW 3. CW 3 admitted to me that he had fraudulently obtained a driver's license in the name of Raimondas Gitelis. I therefore believe that the wire transfer by Raimondas Gitelis to Reika was completed by CW 3.

(20) I have spoken with Special Agent Peter Shepard, DSS, and reviewed his reports of interview in this matter. Special Agent Peter Shepard called Darius Reika in Klaipeda, Lithuania on September 26, 2003 at a telephone number supplied by CW 3. CW 3 advised me that this was the telephone number that he used when he spoke with Reika. I was also present two days earlier on September 24, 2003 when CW 3 placed a call in my presence to Darius Reika using

7

that number. At that time, we solicited Reika's cooperation in our investigation into visa fraud and bribery. On November 12, I was present when a phone call was placed to Darius Reika using the telephone number supplied by CW 3. CW 3, his attorney, Ausa Kinney, a certified court interpreter and myself were present. Once again, we solicited Reika's cooperation. Reika advised us that if he felt threatened with criminal charges, he would flee and disappear so that we would not be able to find him again.

(21) On September 26, 2003, SA Shepard spoke to Reika using a Court certified translator by the name of Raymond Kavilaukas. Shepard advised Reika that his participation in the conversation was voluntary and solicited Reika's cooperation. Reika agreed to speak with SA Shepard. SA Shepard explained that he was investigating a visa fraud /bribery case and understood that Reika was acquiring visas. SA Shepard inquired how Reika obtained the visas. Reika explained that he knew a man ("the middleman")who had a contact at the American embassy and that the man was paying the American embassy officer $1,500 to $2,000 in cash for each visa. Reika stated that he had been involved in obtaining at least nine visas through bribery to the United States. Reika explained that the American was very cautious and would meet the middleman at one restaurant in Vilnius, Lithuania to pass the middleman the passport and embassy fee, and then would meet the middleman at some later point at a different restaurant and exchange the passport now containing an American visa for the cash. Reika understood that he was paying bribes through the middleman to a corrupt American employee at the American Embassy who issued the visas in exchange for cash payments.

8

## STATUTES

22.     Title 18, United States Code, Section 371 provides in pertinent part:

If two or more people conspire either to commit any offense against the United States , or to defraud the United States or any agency thereof, in any manner, or for any purpose and one or more of such persons do any act to effect the object of the conspiracy ... [ they have violated this statute]

23.     Title 18, United States Code, Section 1546 provides in pertinent part:

Whoever knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained ..... [has violated this statute]

24. Title 18, United States Code, Section 201(B)(1)(A) provides:

(B) Whoever
     (1) directly or indirectly, corruptly gives, offers or promises anything of value to any public official ... with intent
          (A) to influence any official act...
          [has violated this statute].

25. Title 18, United States Code, Section 201(B)(1)(A) defines public official as:

an officer or employee acting for or on behalf of the United States or any department, agency, or branch of the United States ... in any official function under or by authority of any such department, agency of branch of government ......

26. Title 18, United States Code, Section 2 provides:

Who commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal.

9

## CONCLUSION

27. Based upon the foregoing, I respectfully submit that there is probable cause to believe that Darius Reika conspired and agreed with others to commit visa fraud and bribery i.e., to pay cash bribes to officer at the American Embassy in Lithuania to cause the issuance of visas to individuals to enter the United States, all in violation of Title 18, United States Code, Sections 2, 371, 201(b)(1)(A) and 1546.

28. I have read the above and it is true and correct to the best of my knowledge and belief.

Special Agent Matthew Sweeney
Diplomatic Security Service
United States Department of States

Subscribed and Sworn to me
this         Day of November 2003

United States Magistrate Judge

10